**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**DONNA SCARPINATI DE OLIVEIRA,**

               **Plaintiff,**

       **-v-**                            **1:11-CV-393 (NAM/RFT)**

**CAIRO-DURHAM CENTRAL SCHOOL DISTRICT; CAIRO-DURHAM BOARD OF EDUCATION; CAIRO-DURHAM TEACHER'S ASSOCIATION; SALLY SHARKEY, Individually and as Superintendent of Schools as aider and abettor; SUSAN KUSMINSKY, Individually and as President of the Board of Education as aider and abettor; JUSTIN KARKER, Individually and as President of the Cairo-Durham Teachers Association as aider and abettor,**

               **Defendants.**
_____

**APPEARANCES:**

Cooper Erving & Savage LLP
Carlo Alexandre C. de Oliveira, Esq.,
Philip G. Steck, Esq.
39 North Pearl Street
Albany, New York 12207-2797
Attorneys for Donna Scarpinati de Oliveira

Girvin & Ferlazzo, P.C.
Patrick J. Fitzgerald, Esq., of counsel
Scott P. Quesnel, Esq., of counsel
20 Corporate Woods Boulevard
Albany, New York 12211
Attorneys for Cairo-Durham Central School District,
Cairo-Durham Board of Education,
Sally Sharkey and Susan Kusminsky

New York State United Teachers
Office of General Counsel
Richard E. Casagrande, General Counsel
Anthony J. Brock, Esq., of counsel
800 Troy-Schenectady Road
Latham, New York 12110-2455

Attorneys for Cairo-Durham Teacher's Association
and Justin Karker

**Hon. Norman A. Mordue, Senior U.S. District Judge:**

**MEMORANDUM-DECISION AND ORDER**

**INTRODUCTION**

In July 2009, plaintiff Donna Scarpinati de Oliveira, an elementary school teacher, took a 12-week leave of absence following the birth of her child. Approximately six months after returning to work she received notice that, due to budgetary cuts, as one of the four least senior teachers in the elementary school, she would be laid off at the end of the school year. Plaintiff asserts claims under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601; Title VII of the Civil Rights Act, 42 U.S.C. § 2000e et seq. ("Title VII"); 42 U.S.C. § 1983 ("section 1983"); the Pregnancy Discrimination Act, 42 U.S.C. § 2000e(k) ("PDA"); Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-1688 ("Title IX"); and the New York State Human Rights Law, Executive Law §§ 290 et seq. ("NYSHRL"). Dkt. No. 4.

Pending before the Court are three motions: defendants Cairo Durham Teacher's Association ("Teacher's Association" or "Union") and Justin Karker, President of the Teacher's Association, move (Dkt. No. 84) for summary judgment under Fed. R .Civ. P.56; plaintiff moves (Dkt. No. 85) for summary judgment; and defendants Cairo-Durham Central School District ("District"); Cairo-Durham Board of Education ("Board") (together, "School defendants"); Sally Sharkey, Superintendent of Schools; and Susan Kusminsky, President of the Board of Education, move (Dkt. No. 88) for summary judgment. The Court denies plaintiff's motion for summary judgment and grants defendants' motions for summary judgment.

**FACTS**

Viewed in the light most favorable to plaintiff, the facts are as follows and are undisputed unless noted otherwise. On August 30, 2007, the District hired plaintiff as an elementary education teacher. The District hired a sixth grade math teacher, Peter Goodwin, the same day. Material to this case is the sequence in which plaintiff and Goodwin were appointed at the August 30, 2007 Board of Education meeting. The meeting minutes state:

> c.      Appoint Donna Scarpinati-Oliveira to a 3 year probationary position as a Cairo Elementary teacher . . . effective September 1, 2007 through August 31, 2010. Ms. Scarpinati-Oliveira holds provisional certification in PreKindergarten, Kindergarten & grades 1-6.

> d.      Appoint Peter Goodwin to a 3 year probationary position as a 6th Grade Math teacher . . . effective September 1, 2007 through August 31, 2010. Mr. Goodwin holds initial certification in Mathematics (Grades 5-9).

Dkt. No. 85-2. Even though they were hired on the same day, in the District's view, plaintiff was the senior employee because her name precedes Goodwin's in the Board minutes. Also pertinent to the issues in this case is the appointment of Erin Murphy, who the District hired as a sixth grade English teacher on September 20, 2007.[1]

Plaintiff taught fourth grade during the 2007-2008 school year and first grade during the

---

[1]The "Personnel Items" in the Board minutes from the meeting on September 20, 2007 include the following:

> i.      Appoint Erin Murphy to a 3 year probationary position as a 6th grade English teacher at the Middle School . . . effective October 1, 2007 through September 30, 2010. Ms. Murphy holds Initial Certification in English Language Arts 5-6 and English Language Arts 7-12 . . . .

Dkt. No. 85-2.

2008-2009 school year.[2] In a letter dated June 8, 2009, plaintiff notified Superintendent Sharkey that she would be taking maternity leave as provided for in the contract between the District and the Teachers Association and under the FMLA:

> I am writing to inform you that my maternity leave will be effective on or around July 9, 2009 or as necessary by the birth of my child. It is my intention to take my maternity leave provided by our contract and FMLA leave, subject to the safe delivery of my child. I plan to take a portion of the beginning of next year, after my period of disability has ended, unpaid. I plan to return to work at Cairo Elementary School on October 13, 2009.
>
> I understand that my FMLA leave will run concurrently with my period of disability that will extend beyond the statutory period provided for childbirth and recovery, it is also my understanding that Cairo-Durham Central School District will continue to pay its share of my health insurance cost during the period of my disability and/or FMLA leave.

Dkt. No. 88-21.

In a letter to plaintiff dated July 16, 2009, Superintendent Sharkey wrote:

> This letter is notify you that, at the Board of Education meeting on July 9, 2009, the Board approved your leave request beginning on or about July 9, 2009 through October 13, 2009 for the purpose of disability (maternity) and child care leave. Upon verification from your physical that you are disabled, and to the extent that you have accumulated sick leave, you will be paid for up to the first six (6) weeks of the leave in accordance with the CDTA Bargaining Agreement (Article 5C). Any period beyond the first 6 weeks will be unpaid.

Dkt. No. 90-1.[3]

On or about August 19, 2009, the District and Superintendent Sharkey issued plaintiff a notice regarding her request for "Family/Medical Leave", which advised as follows:

---

[2]Although the parties do not specify which grades are taught at the elementary school, i.e., kindergarten through fourth grade or kindergarten through fifth grade, it is undisputed that sixth grade is taught at the middle school.

[3]Plaintiff indicated in her deposition testimony that she took eight weeks of paid leave. Dkt. No. 88-8.

Except as explained below, you have a right under, the FMLA for up to 12 weeks of unpaid leave in a 12 month period for the reasons listed above. Also, your health benefits must be maintained during any period of unpaid leave under the same conditions as if you continued to work, and you must be reinstated to the same or an equivalent job with the same pay, benefits, and terms and conditions of employment on your return from leave. If you do not return to work following FMLA leave for a reason other than: (1) the continuation, recurrence, or onset of a serious health condition which would entitle you to FMLA leave; or (2) other circumstances beyond your control, you may be required to reimburse us for our share of health insurance premiums paid on your behalf during your FMLA leave.

Dkt. No. 84-4. The notice further advised plaintiff: that she was eligible for leave under the FMLA; that it would be counted against her annual FMLA leave entitlement; and that she would not be required to furnish medical certification.

Plaintiff received 8 weeks of paid leave: July 15, 2009 to September 8, 2009. For the 23 school days between September 9, 2009 and October 13, 2009, when she returned to work, plaintiff was on unpaid FMLA leave.

According to Superintendent Sharkey, during the 2009-2010 school year, it became apparent that the budget for the 2010-2011 school year "would have to include substantial reductions, including reductions in staffing." She began working with the Teacher's Association to prepare an elementary education tenure area seniority list. Superintendent Sharkey states in her affidavit that: "Consistent with applicable law, when creating and updating its tenure are seniority lists the School District credited teachers with each day of paid employment with the School District (including paid work days and paid leave days) beginning from the commencement of a teacher's probationary period." According to Sharkey, "in accordance with the law and decisions of the New York State Commissioner of Education, periods of unpaid leave, for whatever purpose, were not credited for seniority calculation purposes."

In February 2010, the District's attorney, Christine Lanchantin, Esq.,and Superintendent

-5-

Sharkey's secretary, Barbara Agostinoni, exchanged several emails regarding the seniority lists that Agostinoni had been "working on" and providing to Lanchantin for review. In the emails, Agostinoni and Lanchantin discussed the issue of tenure, whether tenure was defined for particular teachers upon appointment by the Board, how to "break the tie" "as far as persons with the same seniority, appointed at the same board meeting". Plaintiff is not mentioned in the emails. In an affidavit, Lanchantin explained the process she used in assessing the District's seniority lists, she states:

> In performing this task I reviewed information pertaining to particular teachers' certification areas, dates of appointments, and periods of unpaid leave.
> Consistent with applicable law and regulations, I ensured that when creating and updating its tenure area seniority lists the School District credited teachers with each day of paid employment with the School District (including paid work days and paid leave days) beginning from the commencement of a teacher's probationary period (or long term substitute service with the School District, if applicable).
> . . . I advised the School District that ,based upon my knowledge and understanding of the Education Law and Regulations of the Commissioner of Education, periods of <u>unpaid</u> leave, taken for whatever purpose, were not credited for seniority calculation purposes.
> My determination that the period of unpaid leave taken by [plaintiff] during the early part of the 2009 - 2010 school year should not be included in her seniority calculation and subsequent advice to the School District regarding same were in no way related to [plaintiff], her gender, her pregnancy status, or any FMLA leave . . . .

Dkt. No. 88-16 (internal paragraph numbers omitted).

On March 4, 2010, Superintendent Sharkey and Scott Richards, the elementary school principal, met with plaintiff to inform her that as the "fourth least senior teacher" in the elementary tenure area, she was being laid off.[4] Superintendent Sharkey told plaintiff that "the

---

[4]Section 3013 of the New York Education Law states, in pertinent part: "Whenever a trustee, board of trustee,1 board of education or board of cooperative educational services abolishes a position under this chapter, the services of the teacher having the least seniority in the system within the tenure of the position abolished shall be discontinued." N.Y. Educ. Law § 3013(2).

fact that she took 23 days of unpaid leave" in the beginning of that school year, "play[ed] a role in determining seniority" and that the seniority determination "came down to those days."

At a subsequent administrative hearing, plaintiff recounted this meeting as follows:

> When I got in, Mr. Richards was silent. The Superintendent talked and said due to budgetary reasons they were cutting four elementary positions in the following year and mine would be one of them. Then she went on to ask about how my baby was and when she was born and how old she was, and I told her, and then the conversation immediately went to, "Those 24 days got you," and I was thinking to myself, "24 days got me." She referred to 23 days in her affidavit. I heard 24 days on that meeting day, and I'm thinking to myself, "24 got me," and then I brought up, "Well, the 24 days that I took were within my FMLA parameter leave days." And then I was told that the purpose of FMLA was so that she could not fire someone before they got back, that it was so they had job security and that unpaid leave was unpaid leave and it was the law. That's what I was told.

Dkt. No. 85-6.

Following the meeting, plaintiff sought her Union's assistance and wrote a letter, dated March 6, 2010, to Justin Karker, the Union president:

> I have spoken with a few people familiar with FMLA law and I have also conducted my own research of the law. My conclusion is that I could not have been terminated for the reasons that were given to me . . . .
>
> The main question that I am asking myself is:
>
> (1) Can FMLA leave be used in any way to justify my termination? If the answer is yes, then I would have no claim. If the answer is no, then I have a very strong case.
>
> . . .
>
> It is important that you read my statement attached to understand my concerns. Superintendent, Sally Sharkey, told me that the reason for my termination was that during my FMLA leave for the birth of my child, I did not accrue seniority and, as a result, the 24 days of unpaid leave I took was what made her decide to terminate my position.

I am familiar with the concept of seniority. There is no[] doubt that an employee with less seniority than another would be first to be terminated when cuts are necessary. However, this is the million dollar question:

(2) Can the employer count the time the employee was out on unpaid FMLA leave against me in any way because if that was the case, why would an employee ever take FMLA leave if that leave could be used against him or her?

I would have no problem if, before I took my FMLA leave, I had less seniority than someone else and, therefore, I was the one to go. However, my termination cannot be based on my unpaid FMLA leave. I also learned that another teacher who I believe has more seniority than people who have not been cut has also been terminated while out on maternity leave. I am also aware of another instance where teachers who were pregnant or due to be out on child care leave were told in an e-mail that they must attend summer professional development. I attended the summer professional development courses within weeks of my child's birth because I was scared I would be in trouble if I did not go. Therefore, the District's actions are very suspicious and, in my opinion, illegal. I would like to discuss these incidents with our counsel.
In sum, the District cannot use my FMLA leave against me in any way. I feel that I have been punished by having taken FMLA leave.

Please, share this letter and the enclosed documents with our Union counsel as soon as possible. My family and I have been deeply affected by this termination and I want to make sure that my rights are protected.

Dkt. No. 84-9.

Plaintiff and Karker met on March 12, 2010. Plaintiff told him that she was concerned

"that Salley Sharkey was targeting teachers on maternity leave because Maria Fiorita,[5] a senior

---

[5]Lanchantin states in her affidavit, that at some point she learned that Fiorita's seniority calculation was incorrect:

during the process of creating and preparing the School District's tenure area seniority lists, I initially did not include in Ms. Fiorita' s seniority calculation a period of service that qualified for *Jarema Credit* (i.e. , seniority credit for long-term substitute service provided immediately preceding a probationary appointment). This credit was not initially included by me in my calculations because the School District did not recognize the potential relevance of long-term substitute service to a teacher's seniority and inadvertently failed to provide that information to me.

teacher in the school who happened to be out on child care leave at the same time as I was, was also being laid off. Mr. Karker assured me that he would investigate my concerns and that he would be crossing the 't's and dotting the 'i's to make sure all my concerns were taken care of." In his affidavit, Karker states that he advised plaintiff that he "would send her concerns to New York State United Teachers ("NYSUT"), the Association's statewide affiliate 'within the next couple days' to assist" him and the Union "with determining whether or not plaintiff was the proper subject of layoff due to being the least senior elementary teacher."

Although the record does not indicate when, eventually, plaintiff learned that the District had excluded Goodwin and Murphy from the elementary seniority list. Plaintiff believed that, although they taught sixth grade math and English in the middle school, as sixth grade teachers they were nevertheless deemed elementary school teachers under New York law and should have been included on the elementary tenure area seniority list. Had they been included, plaintiff, by her own calculation, would have been senior to both of them since she was appointed before Goodwin (according to the Board minutes) and was appointed 21 before Murphy. Plaintiff, therefore, would have been sixth, rather than fourth, on the elementary seniority list, and would not have lost her job.

Following the layoff meeting with plaintiff, the District contacted Lanchantin regarding the seniority lists again. In an email to Superintendent Sharkey dated March 15, 2010, Lanchantin wrote:

> Hi Sally - I'm sorry that you are still unsure of your seniority lists. As I understand it . . . there are 2 issues:

---

Dkt. No. 88-16.

1. Whether unpaid leaves count toward seniority.
2. Tenure area of Erin Murphy and Peter Goodwin[.]

I regard to 1, I am attaching several cases that discuss the concept that unpaid leave does not count as service to the district. This is a well known and universally accepted concept.

In regard to 2, . . . . While I understand that, based solely on Part 30 it can be argued that "6th grade is 6th grade" and can only be in the elementary tenure area, I believe there are other factors to be considered.

Specifically, teachers generally cannot be tenured in an area in which they are not certified to teach. So, if these teachers are placed in the elementary tenure area and a 6th grade English position is cut or you go back to traditional elementary school (K-6), they would have to be placed in a traditional classroom for which they are not certified, and then they would have to be fired as uncertified.
                                                                                        . . .

I have called SED and gave them the 2 options. Their initial reaction was to agree with my initial interpretation, but I played devil's advocate and gave them the Part 30 interpretation. They didn't know the answer and are currently researching it . . . .

Last, I happen [sic] to be in a conference with some NYSUT reps on Friday and asked them where they would be with this. They did not feel an Elementary tenure was appropriate either. They went back today and researched it, and agreed that they could not find anything on point either, but agreed with me that the "lesser of the 2 evils" was the content area. It appears that, once again, SED did not consider the effects of these new certifications.

I honestly see more issued by putting them in an elementary tenure area, but if you are uncomfortable with that, then an elementary designation is supportable.

Karker testified that he forwarded plaintiff's March 6, 2010 letter to NYSUT, contacted Peter Stelling, the labor relations specialist assigned to the District, and met with his executive board. Karker provided Stelling with the names of all of the teachers in jeopardy, including plaintiff, Goodwin and Murphy as well as their "background with regard to their employment history, dates of hire, longevity of service, leaves of absence, both paid and unpaid, information regarding total length of service in the district as well as length of service in the tenure area."

In investigating the issue of the exclusion of sixth grade teachers from the elementary tenure list, Stelling testified that he spoke with Lanchantin and consulted the NYSUT staff director. He also raised the issue at the periodic staff meeting, which was attended by "all of the labor relations specialists and the staff director" and everyone "concurred" that the District properly excluded sixth grade teachers from the tenure area. At his deposition, Stelling testified about NYSUT's consideration of plaintiff's claims:

Q. So Mr. Karker called you to talk about the Family and Medical Leave Act, among other things, as it related to Donna De Oliveira's seniority; isn't that correct?

A. Many times.

Q. And isn't it true that Mr. Karker and you had agreed that the union should work this issue out as to how the proper seniority list was determined, that the union should work this out with the district?

A . I wouldn't say work it out. I would say develop our own independent conclusions and compare and contrast those conclusions with those of the district.

Q. Did you come at some point to the conclusion that the union and the district had an identical view of this situation?
. . .

A. Yes. As part of the process, to put it in its simplest terms, the local president's role is to deal with the superintendent. My role is to deal with the attorney or labor relations specialist, whichever the case may be, who represents the district.

And the question arose, I believe you are referring to, and correct me if I'm wrong, the placement of Ms. Murphy and Mr. Goodwin. And they were appointed to the secondary tenure areas of I believe it was social studies and English. It may have been social studies and ESL. But, at any rate, they were secondary tenure area appointments. They achieved tenure within those appointments and they had served teaching secondary subjects in a middle school setting, an experimental middle school.

The question arose as to their correct placement . And I discussed it extensively with Mr. Karker. We examined, to the best of our abilities, every aspect of the question. And it occurred to me in that examination, A, they were appointed to the secondary area; B, they achieved tenure in the secondary area; and C, that's where their certification lied.

And, lastly, that if they were placed in the elementary area instead of the

secondary area a nonsensical result could occur, in that if they were laid off they would be on a preferred eligibility list in the elementary area and they could be recalled because a person with secondary certification may only teach in the elementary area in a middle school. However, if they are laid off and on a preferred eligibility list in the elementary tenure area they could be recalled to a kindergarten job, a first, a second, a third, a fourth grade job, for which they would not be certified. That seems to be a harsh and absurd result, in my opinion.

And I did have occasion to call Kris Lanchantin of the law firm of Girvin and Ferlazzo, who represents Cairo in certain matters . . . she is the person who usually deals with seniority questions and tenure area questions, and so forth, for their firm.

. . .

Q . So you reached agreement with the school district through their attorneys on this issue; correct ?

A . We shared the same opinion. When you say reached , it sounds like something was worked out or argued and someone was swayed. And there was none of that. It was simply having an opinion.

Dkt. No. 85-16. Stelling then advised Karker that he and his staff director "concurred with regard to the tenure area placement and with regard to the seniority calculations."

In a letter to plaintiff dated March 31, 2010, Superintendent Sharkey informed plaintiff that the Board abolished "4 positions in the Elementary Education tenure area, effective June 30, 2010" and that based on her "seniority in the Elementary Education tenure area" her employment would be terminated.[6]

Plaintiff and Karker met for the last time on April 20, 2010. He states in his affidavit that he advised her "that after a careful review of all documents, pertinent Board of Education minutes, consultations with NYSUT and consultation with the [Union] Executive Committee, that the [Union] believed that the district had properly placed plaintiff on the layoff list." According to his affidavit, Karker also told plaintiff that:

---

[6]Plaintiff did not, however, receive the letter until April 22, 2010.

a. NYSUT came to the conclusion that sixth grade teachers were properly excluded from the elementary tenure list;

b. That regardless of the inclusion of sixth grade teachers, plaintiff was still the least senior elementary teacher and the proper subject of layoff; and

c. That the law did not support plaintiffs assertion that her 23 days of unpaid leave could count towards her seniority, specifically, showing her a portion of the American Federation of Teachers Publication, entitled "A Guide to the Family and Medical Leave Act," which clearly states "[u]npaid FMLA does not constitute service credit...."

Dkt. No. 84-2.

Plaintiff states in her affidavit that she asked Karker "about Peter Goodwin who was an elementary education Sixth Grade teacher appointed after me in the minutes of Board of Education" and that Karker responded that he had "looked into it and that Sixth Grade had nothing" to do with her seniority. Karker states in his affidavit that he informed plaintiff that: "because the [Union] believed that she was the least senior teacher in the elementary tenure area, the [Union] would not file a grievance or take any other action on her behalf and that if she wanted to challenge the layoff, she could pursue the claim on her own, or retain private counsel to assist her." Plaintiff asked to see the seniority list, but Karker refused to provide her with a copy. Karker testified that, at the time, he erroneously believed the list was confidential.

According to an affidavit by Tara Mentes, a reading teacher at Cairo Elementary, on April 30, 2010, she and others, including Principal Richards, participated in a school meeting to plan for the upcoming school year. At the meeting, they discussed "the abolishment of the positions of four teachers in our building." Mentes asked Principal Richards whether there were any sixth grade teachers with less seniority than plaintiff:

I asked this question because I believed there to be at least one sixth grade teacher with less seniority. Mr. Richards stated that he believed that there were two sixth

grade teachers with less seniority than Ms. Oliveira. I stated that it was my understanding that sixth grade, regardless of whether the school chooses to departmentalize and assign teachers to specific subject areas, still falls under the elementary tenure area. Thus, all sixth grade teachers would be placed on the elementary seniority list. Mr. Richards indicated that this was his understanding, too, but that the District and the Union . . . were in firm agreement that this was not the case. Mr. Richards further stated that he had not been given the specific reasoning behind their position on this issue.

Dkt. No. 85-2.

On May 1, 2010, Mentes told plaintiff about the discussion with Principal Richards. Plaintiff states that she "confronted" Principal Richards "about such agreement" and he "confirmed that the Superintendent and my Association did agree to exclude two 6th grade teachers from the elementary education tenure area.

In a letter dated May 3, 2010, to Karker, plaintiff's husband, Carlo de Oliveira, an attorney, wrote "to express our disappointment with the Teacher's Union's choice not to represent her in her claims against the Cairo-Durham Central School District for sex discrimination" and to ask the Union to file a grievance on plaintiff's behalf. de Oliveira argued that the Superintendent's statement that plaintiff was being terminated "because of '24 days' she has taken out as unpaid FMLA leave" was evidence of retaliation. He further argued that: the District failed to restore plaintiff "to the same level of seniority" she "accrued prior to the commencement of FMLA leave;"[7] the District laid off another teacher who was on child care leave, even though she had more seniority than others; and there was a teacher with less seniority than plaintiff in the elementary education tenure area who was not laid off and whose name the "Union has chosen to exclude . . . from the seniority list of employees subject to termination."

---

[7] Although, Mr. De Oliveira acknowledged, "one cannot accrue seniority while out on FMLA leave". Dkt. 84-7.

-14-

In a letter dated May 6, 2010, Karker responded:

> As far as the claim the [Union] owes fair representation in the FMLA matter the following steps were taken to address all questions, which were raised by our member Donna Scarpinati de Oliveira. Once in possession of the 'seniority list' I confirmed the information regarding the employment timeline for our member. This was done by obtaining school board minutes. In addition I spoke directly to your wife to confirm details of employment.
>
> The seniority list you reference is a district level document, which is comp[iled] and housed in the district office. My obligation to my membership is to ensure accuracy of the document. At any time a member can request to see the document with the district.

Dkt. No. 84-12. Karker further stated: "You concede in your letter the fact that an employee cannot accrue seniority while on FMLA leave and this is correct. An employee on leave can only accrue seniority if the employee is being paid during such leave. Please refer to Educational Law 11.41, 14.96." Karker also stated that it was not the Union's responsibility to represent plaintiff "in a sex discrimination case" or in connection with an FMLA claim and suggested plaintiff or her husband contact the New York State Division of Human Rights or the "Department of Labor Wage and Hour Division".

**Administrative Proceedings - Grievance**

On May 7, 2010, plaintiff filed a grievance arguing that the District could not use her "taking of FMLA leave as a <u>negative factor</u> in employment actions such as termination." Plaintiff cited four provisions of the CBA[8] in support her argument, including Article 5.B.6, which provides:

---

[8]In addition to Articles 5.B.6. and 8.E.7., which are discussed above, plaintiff also claimed the District violated Article 13.A., which pertained to "middle school/high school work load" and vacancies, as well as Article 23.A., which stated that: "This Agreement shall constitute the full and complete commitments between both parties and may be . . . modified only through voluntary, mutual agreement of the parties in a written and signed amendment to his Agreement." Dkt. No. 84-6.

> Any person returning from child care leave will return at the salary base the were paid when they went on leave plus the percentage increases negotiated for the year of their return to employment. In addition, upon returning from said leave the teacher shall have previously accrued benefits restored.

Dkt. Nos. 85-2, 84-6.

Plaintiff also challenged the District's exclusion of Goodwin and Murphy from the tenure list, asserting that pursuant to New York Education Law § 3012-a[9], as sixth grade teachers, Goodwin and Murphy, fell within the elementary tenure area, and were less senior than she was because they were both appointed after her. In support of this assertion, plaintiff also cited Article 8.E.7. of the Collective Bargaining Agreement ("CBA"), which states:

> It is understood that the schedule of the 6th grade teachers shall be the same as those of the grades 7-12 teachers assigned to teach in a block as set forth above. However, the statutory rights which are applicable to 6th grade teachers (e.g. seniority, tenure, and certification) shall remain unchanged.

In a letter dated May 24, 2010, Superintendent Sharkey denied plaintiff's grievance:

> Essentially, your grievance is based upon an assertion that you should not have been the elementary teacher who was laid off as a result of the recent abolition of four elementary teaching positions in developing the budget for the 2010-2011 school year because either it involved an inappropriate application of FMLA or that you were not the least senior member affected.
> . . .
> You commenced your employment as an elementary teacher in the elementary education tenure area effective September 1, 2007 . . . four other elementary teachers . . .were . . . appointed at a board meeting on August 20, 2007 where as you were appointed at a board meeting on August 30, 2007.
>
> In addition, as is important in determining seniority, you were absent on unpaid leave for twenty-three days at the beginning of the 2009-2010 school year. These days were for unpaid child care leave and were taken pursuant to the Family and Medical

---

[9]Section 3012-a is entitled "Elementary tenure area" and states: "elementary tenure area shall mean kindergarten through grade six for teachers employed in such grade levels" N.Y. Educ. Law § 3012-a.

Leave Act. As a result of this unpaid leave, you were determined to have less seniority than the other four elementary teachers who commenced their probationary appointments effective September 1, 2007. [Note: of the four elementary teachers excessed, the other three were appointed after September 1, 2007 and were therefore less senior than you or the other four teachers].

While the above was properly determined based on you use of unpaid leave, the same result would have occurred even if you had not taken any unpaid leave. When school districts have to lay off teachers who have the same seniority, they are permitted under the law to adopt some "tie breaking" procedure . . . . The . . . District has long utilized a tie breaking procedure by which we first look at the board dates teachers are appointed with the teacher appointed at an earlier date being more senior and, if appointed at the same board meeting, the order in which the teachers appear on the agenda with the person appearing first as being more senior. . . . Thus, even if you had not been absent on unpaid leave for 23 days and were therefore not less senior than the other four elementary teachers who also commenced their probationary appointment on September 1, 2007, you would still have been excessed as you were appointed at a later board meeting than those other teachers.

. . .

Upon your return to your teaching position on October 13, 2009, the seniority that you had accrued up to the commencement of your leave (i.e. at the end of the 2008-2009 school year) remained and was fully reinstated and you commenced accruing additional seniority as of that date. However, you are not entitled to the benefit of the 23 days of unpaid leave for seniority purposes. As stated above, the fact that you requested and were granted FMLA leave is not in issue and was not a factor in the determination that your seniority resulted in you being one of the elementary teachers laid off. Rather, the fact that you were absent on unpaid leave (of whatever origin) was a factor and did result in a conclusion that you had less seniority than the other four elementary teachers whose probationary appointments began on September 1, 2007.

Regarding plaintiff's concern about the exclusion of sixth grade teachers from the seniority list, Superintendent Sharkey wrote:

Mr. Goodwin is in the math tenure area and Ms. Murphy is in the [English] tenure area. Neither is certified to teach in the elementary teaching area but is permitted to teach in their subject areas in the sixth grade, as well as higher grades . . . . These circumstances do not mean they are in the elementary tenure are. Once positions are abolished it is required by law that teachers be laid off in inverse order of seniority in the tenure area affected. Four elementary teaching positions were abolished resulting in the four least senior teachers in the elementary teaching tenure area being

laid off . . . . It could not have been Mr. Goodwin or Ms. Murphy.

Plaintiff appealed the denial of her grievance to the Board of Education. In a letter dated June 21, 2010, the Board denied the appeal: "The Board reviewed the areas of disagreement you had with Superintendent Sharkey's response and, quite simply, disagrees with your assertions. Much of the argument you make and the submissions you attached are irrelevant to any alleged violation of the collective bargaining agreement."

On June 23, 2010, plaintiff appealed the denial of her grievance to the Commissioner of Education. In a decision entered on September 18, 2012, the Commissioner of Education, citing N.Y. Educ. Law §§ 3012-a and 3013(2) and the Rules of the Board of Regents, §§ 30-1.1(f), 30-1.5 and 30-1.1(b), found that because "both Goodwin and Murphy were teaching one of the common branch subjects in the daily program of an elementary school classroom, I find that they were serving in the elementary tenure area and should have been included on the seniority list for such tenure area" and directed the District to "amend its seniority list for the elementary tenure area accordingly."[10] The Commissioner further found that plaintiff "was still the least senior teacher in the elementary area" because she could not accrue seniority during her twenty-three day unpaid leave of absence and therefore "served 23 days less than Goodwin and at least three days less than Murphy." Thus, the Commissioner concluded, that the Board was not "arbitrary or capricious in terminating [plaintiff's] employment."

**Administrative Proceedings - Improper Practice Charge**

---

[10]In January 2011, following Superintendent Sharkey's review of "minutes from past board meetings" which showed that "many teachers were never assigned a tenure area when appointed to their tenure track probationary positions", the Board assigned tenure areas to 34 teachers.

On May 18, 2010, plaintiff filed an Improper Practice Charge against the Teachers Association with the New York State Public Employment Relations Board ("PERB"). Plaintiff alleged that the Union "breached its duty of fair representation" by "refusing to investigate and file a grievance on my behalf in light of the District's impermissible use of my FMLA leave as a factor in their decision to lay me off." In the charge, plaintiff also challenged the Teacher Association's participation in the exclusion of sixth grade teachers from the elementary tenure list. Plaintiff asserted that these events violated N.Y. Civ. Serv. Law §§ 209-a(2)(a) and (c).[11]

A formal PERB hearing was held before an administrative law judge on December 15, 2010 and March 25, 2011, at which plaintiff, Mentes and Karker testified. On September 18, 2013, the administrative law judge issued a decision dismissing the charge in its entirety, finding that the Union did not breach its duty of fair representation to plaintiff, did not act in "a discriminatory or bad faith fashion" toward plaintiff, did not violate plaintiff's contractual rights and did not act arbitrarily when it refused to file a grievance.

**Administrative Proceedings - Division of Human Rights Complaint**

On September 10, 2010, plaintiff filed complaints against the District, the Board of Education and the Teachers Association with the New York State Division of Human Rights alleging "unlawful discriminatory practice relating to employment because of disability, sex" in

---

[11]Subsection 2 of N.Y. Civ. Serv. Law § 209-a states, in pertinent part:

2. Improper employee organization practices. It shall be an improper practice for an employee organization or its agents deliberately (a) to interfere with, restrain or coerce public employees in the exercise of the rights granted in section two hundred two, or to cause, or attempt to cause, a public employer to do so . . . or (c) to breach its duty of fair representation to public employees under this article.

N.Y. Civ. Serv. Law §§ 209-a(2)(a) and (c)

violation of the NYSHRL. The Division of Human Rights issued right to sue letters on March 29, 2011 and April 5, 2011. Plaintiff filed this action on April 11, 2011.

**CBA - Paid Sick Leave**

The CBA's leave provisions and defendants' implementation of them are the subject of plaintiff's Title VII, Pregnancy Discrimination Act, § 1983 Equal Protection, Title IX and state Human Rights Law claims. Plaintiff claims that defendants allowed men to use paid sick leave for purposes of child care following the birth of their children but did not allow women to use paid sick leave for purposes of child care unless they provided proof of disability.

The CBA contains the terms and conditions under which teachers are authorized to take paid and unpaid leave. Under the CBA, each teacher receives "sick leave with pay for fourteen (14) days per year accumulative to 200 days for sick leave purposes." Art. 5.B.1. Teachers may use "[u]p to five (5) consecutive days of [sick leave]. . . for personally attending to family illness or to attend the funeral of the immediate family. Any time beyond the five consecutive days shall be at the discretion of the Superintendent of Schools." Art. 5.B.2.

Article 5, section C. governs "Child Care" leave and provides:

C. Child Care

    1. The teacher will confer with the Superintendent of Schools or his/her designee, to set a firm date at least thirty (30) days prior to the start of the unpaid leave for the purpose of child care. Such leave must commence at the date agreed upon by the teacher and the Superintendent of Schools.

    2. The maximum period of absence will not exceed three (3) semesters beginning with the semester of the leave. Sixty (60) days prior to the end of the leave, the teacher will notify the Superintendent of Schools in writing of the teacher's date of return. A teacher may return prior to this time only at the beginning of a school semester and with sixty (60) days notice.

    3. The teacher shall have the option of continuing in the health insurance

program during such leave at the teacher's own expense if allowed by the carrier.

4. During the period of disability, as certified by a physician, the teacher will be allowed to use accumulated sick leave.

5. A teacher adopting a child under the age of four and one-half years will be entitled to leave for child care as specified in Section 3 and 4 above.

6. Any employee returning from child care leave will return at the salary base they were paid when they went on leave plus the percentage increases negotiated for the year of their return to employment. In addition, upon returning from said leave the teacher shall have previously accrued benefits restored.

Teachers are entitled to three other forms of paid leave: jury duty leave; four days of personal leave "solely to conduct personal business which cannot be conducted other than during the work day" and does not "constitute vacation leave"; and three days of professional leave "for the purpose of observing an outstanding teacher . . . at another school or for attending a conference". Art. 5.A., D., and E. The CBA authorizes two forms of unpaid leave: child care leave, as indicated above, and a "[l]eave of absence up to one year without pay for any reason not covered by this Agreement". Art.5.F.

Prior to February 2007, some teachers in the District were allowed to use sick time throughout the entirety of their maternity and child care leave. According to Mark Notarnicola, who was the Union president at the time, Superintendent Sharkey "brought up the issue that she was going to start following the contract as opposed to the practice the district had previously followed for a few years." Notarnicola testified that Superintendent Sharkey indicated that the problem was that these teachers "were using sick time over and above when the contract stated they could and it was a financial burden on the district." Following this discussion the District and the Union executed a memorandum of understanding, which expressly discontinued this practice. It is undated and is signed by Notarnicola, as Union President, and Superintendent Sharkey:

I appreciate our discussion regarding the use of paid sick leave by teachers who are absent due to pregnancy related disability and child care leave. Apparently, we share a mutual acknowledgment that there may have been past occasions in which teachers received different treatment under the contract -by being allowed -to use accumulated sick leave (i.e. beyond the normal 6 to 8 week period of pregnancy related disability). In order to provide consistency of treatment, I am writing to confirm our common understanding.

Article 5.C pertains to child care leave and the conditions associated with such leave. Paragraph 4 clearly states that "During the period of disability, as certified by a physician, the teacher will be allowed to use accumulated sick leave." Article 5 C paragraph 4 gives teachers the right to use accumulated sick leave during the period of pregnancy related disability. However, teachers may not use paid sick leave while on unpaid child care leave. To whatever extent prior instances have deviated from this, I am writing to confirm our understanding·that the District intends to return to the clear contract language.

Since there may be confusion among teachers who are currently using or who may have planned on using accumulated sick leave during child care leave, implementation of the clear language will be effective July 1, 2006. For any leaves continuing beyond or commencing on or after July 1, 2006, no teacher will be able to use accumulated sick leave beyond the period of temporary disability unless certified by a physician.

In February 2006, before the memorandum of understanding went into effect, the District and the Union executed a superseding memorandum of understanding. It is identical in all material respects, except it changes the effective date for the implementation of "the clear language" to February 1, 2007. The postponement of the effective date allowed the superintendent's sister, Susan Russell, to benefit from the prior practice while on disability and child care leave.

In support of her disparate treatment claim, plaintiff has identified three male teachers, who she claims defendants allowed to use paid sick leave to care for their newborn children.

-22-

In a letter dated April 24, 2007[12] to Superintendent Sharkey, Sean Higgins, a Cairo-Durham science teacher, requested leave under the FMLA:

> This letter is in regard[] to a request of 5 days off under the Family Medical Leave Act to be covered by sick days that I have accrued. My wife's approximate due date is around the 30th of May and I would be seeking the time off approximately around that date. This leave is the same approved by the board in 2005 with my first child. If anything else is needed please let me know.

Dkt. No. 85-8. The Board of Education approved this request on May 8, 2007: "Mr. Plank made a motion, seconded by Mr. O'Connell, to approve a leave of 5 days under the Family Medical Leave Act for Sean Higgins commencing on or about May 30th. This leave will be paid using available sick time. Motion carried."

Higgins further states in his affidavit that:

> 6. On April 24, 2007, when Sally Sharkey was Superintendent . . . I requested [a] paid leave of absence under Article 5(B)(2) of the CBA to attend to family illness, which was the postpartum care of my spouse after the birth of our son. I made a written request . . . to take five sick days to care for my spouse, approximately beginning on May 30, 2007. The Board of Education approved this request on May 8, 2007. . . . My son was born on June 3, 2007. I did not use all of my requested leave, but only ended up using four sick days following the birth of my son.

> 7. For both of these leaves of absence, I was able to take paid sick time under Article 5(B)(2) of the CBA, which allows for sick time to be used to personally attend to a family illness, which for me . . . included attending to my wife after the delivery of our children.

> 8. I have never requested to take child care leave under Article 5(C) of the CBA.

Dkt. No. 90-5. Higgins further states that he took his leave of absence "under the 'family illness'

---

[12]In 2005, Higgins previously requested and received approximately two weeks of "paternal leave time" in connection with the delivery of his first child. He used paid sick leave for this time. Because it predates the memorandum of understanding changing the District's practice, the Court finds it irrelevant to the present inquiry.

provision of Article 5(B)(2) so that I could personally attend to my wife's postpartum care.

Christopher LaBarge is a Cairo-Durham elementary teacher. In a letter to Superintendent Sharkey dated February 27, 2007, LaBarge requested leave:

> I would like to notify you of my intention to use five of my accumulated sick days to care for my wife after the expected birth of our child on or about April 16, 2007. I am taking this leave in accordance with article 5, section B, part 2 of the current contract under which I am employed.

Dkt. No. 85-8. At a meeting on March 8, 2007, the Board approved this request: "Approve the leave request of Christopher LaBarge, teacher - CE effective on or about April 16, 2007 and continuing for 5 days. This leave will be paid using accumulated sick time."

In an affidavit, LaBarge states that his request was for a paid leave of absence under Article 5(B)(2) of the CBA "to attend to family illness, which was the postpartum care of my spouse after the birth of our daughter." He further states:

> I had a meeting with Superintendent Sharkey at the beginning of 2007, before submitting my request for a leave of absence, and to clarify my rights under Article 5(B)(2) of the CBA. Former CDTA president, Mark Notarnicola, was on the speaker phone when we held this meeting. At this meeting, the Superintendent informed me that I was entitled to five days of paid leave under Article 5(B)(2) to personally attend to the postpartum care of my wife. However, if I wanted to request a longer leave of absence to further care for my child, I would have to take an unpaid leave of absence under Article 5(C) of the CBA.

Dkt. No. 90-14.

In January 2008, Jason Reinhard, a Cairo-Durham mathematics teacher, requested a leave of absence: "I am requesting the following days leave 2/11-2/15. My wife and I are expecting our second child, a planned c-section, on 2/8." According to the January 24, 2008 Board minutes, the Board approved "the paid leave of Jason Reinhard from 2/11/08-2/15/08 as per the CDTA Agreement, Article 5, B2. This leave will be paid using available sick time." In his affidavit,

-24-

Reinhard states that he took this leave of absence "under the 'family illness' provision of Article 5(B)(2) so that I could personally attend to my wife's postpartum care after her c-section. I did not take any form of child care leave under Article 5(C)."

**DISCUSSION**

**Summary Judgment Standard**

Summary judgment is appropriate when there is no genuine issue with regard to any material fact, and the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). When deciding a summary judgment motion, the court must "resolve all ambiguities and draw all factual inferences in favor of the party opposing the motion." *McPherson v. Coombe*, 174 F.3d 276, 280 (2d Cir. 1999).

**FMLA**

Under the FMLA, employees are "entitled to a total of 12 workweeks of leave during any 12-month period for", among other reasons, "the birth of a son or daughter of the employee and in order to care for such son or daughter." 29 U.S.C. § 2612(a)(1)(A). "While an employee is on FMLA leave it is 'unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided' by the FMLA.'" *Lehtinen v. Town of Greenport*, No. 1:12-cv-393, 2014 WL 3477037, at*7 (N.D.N.Y. July 11, 2014) (quoting 29 U.S.C. § 2615(a)(1)). An employee on FMLA leave is "entitled, on return from such leave" to be restored to the position, or an equivalent position, "of employment held be the employee when the leave commenced". 29 U.S.C. § 2614(a)(1)(A) and (B). Additionally, the "taking of [FMLA leave] shall not result in the loss of any employment benefit accrued prior to the date on which the leave commenced." *Id*. at § 2614(a)(2). The FMLA is not without limitations, however, and instructs

that:

> Nothing in this section shall be construed to entitle any restored employee to –
>
>> (A) the accrual of any seniority or employment benefits during any period of leave; or
>>
>> (B) any right, benefit, or position of employment other than any right, benefit, or position to which the employee would have been entitled had the employee not taken the leave.

*Id*. at § 2614(a)(3).

The Second Circuit recognizes two causes of action under the FMLA for equitable relief and money damages against an employer: (1) interference with FMLA rights; and (2) retaliation for exercising FMLA rights. *Potenza v. City of New York*, 365 F.3d 165, 167-68 (2d Cir. 2004). Plaintiff asserts both in this case.

**FMLA - Interference**

Plaintiff asserts that defendants interfered with her FMLA rights by: (1) failing to restore her to an "equivalent position", deducting twenty-three days from her seniority and rendering her status "inferior" to the status she held prior to taking leave, in violation of 29 U.S.C. 2614(3)(B) and 29 C.F.R. § 825.215(a);[13] (2) failing to inform her "in writing or otherwise, that upon her return from FMLA leave, her seniority status would be reduced by the amount of unpaid FMLA-protected leave she took"; (3) "deducting the time that plaintiff was out on unpaid FMLA leave from [her] seniority status" and using it as a negative factor resulting her in her termination; and (4) "discourag[ing] employees from exercising their FMLA rights" by deducting the leave from

_____

[13]In connection with this claim, plaintiff argues that deducting her seniority status "will discourage employees from exercising their FMLA rights" and that the "Commissioner of Education's Decision is not dispositive of [her] FMLA claims".

-26-

their seniority status.

To establish an interference claim under 29 U.S.C. § 2615(a)(1), a plaintiff must prove that an "employer in some manner impeded the employee's exercise of his or her right[s]" protected provided by the FMLA. *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161,176 (2d Cir. 2006) (citing *King v. Preferred Technical Grp.*, 166 F.3d 887, 891 (7th Cir.1999)). "The regulations promulgated pursuant to the FMLA explain that '[i]nterfering with the exercise of an employee's rights would include, for example, not only refusing to authorize FMLA leave, but discouraging an employee from using such leave,' 29 C.F.R. § 825.220(b), and that '[a]n employer is prohibited from discriminating against employees or prospective employees who have used FMLA leave.'" *Potenza*, 365 F.3d at 167 (2d Cir. 2004) (29 C.F.R. § 825.220(c)) (additional quotation marks omitted).

To establish a prima facie claim of interference with rights under the FMLA, a plaintiff must establish that:

> (1) she is an eligible employee under the FMLA; (2) defendants constitute an employer under the FMLA; (3) she was entitled to leave under the FMLA; (4) that she gave notice to defendants of her intention to take leave; and (5) defendants denied her benefits to which she was entitled by the FMLA.

*Esser v. Rainbow Advertising Sales Corp.*, 448 F.Supp.2d 574, 580 (S.D.N.Y. 2006) (collecting cases). "With interference claims, the issue is simply whether the employer provided the employee with the entitlements set forth in the FMLA-for example, a twelve-week period of leave or reinstatement following a medical leave." *Wanamaker v. Town of Westport Bd. of Educ.*, – F.Supp. 2d –, 2014 WL 1281937, at *14 (D.Conn. Mar. 27, 2014). "The employer's subjective intent is not an issue." *Id.*

The first four factors are undisputed: plaintiff was an eligible employee; defendants are an

employer under the FMLA; she was entitled to leave; and timely notified defendants of her intention to take leave. Finally, plaintiff claims that defendants denied her right to reinstatement by placing her in an inferior position upon her return to work. *See Geromanos v. Columbia Univ.*, 322 F.Supp.2d 420, 428 (S.D.N.Y. 2004) ("Because plaintiff received the full twelve weeks of leave as allowed by the act, the only other right with which Columbia could be found to have interfered is the right to reinstatement at the end of her leave.").

**Interference - Reinstatement to Equivalent Position and Status**

Plaintiff claims that the District and Board violated her right to be reinstated to an equivalent position and status following her FMLA leave because she was ahead of Goodwin and Murphy in terms of seniority prior to her leave and behind them after her leave. "An equivalent position is one that is 'virtually identical' to the employee's former position 'in terms of pay, benefits, and working conditions,' and it 'must involve the same or substantially similar duties and responsibilities, which must entail substantially equivalent skill, effort, responsibility, and authority.'" *Wanamaker v. Westport Bd. of Educ.*, 899 F.Supp.2d 193, 206 (D. Conn. 2012); *see also* 29 C.F.R. § 825.215(e) ("[a]n equivalent position must have substantially similar duties, conditions, responsibilities, privileges and status as the employee's original position").

Section 2614 of the FMLA states that while an employee is entitled, on return from leave, "to be restored to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment", there are limitations: "Nothing in this section shall be construed to entitle any restored employee to (A) the accrual of any seniority or employment benefits during any period of leave". 29 U.S.C. § 2614(1)(3)(A). In addressing "[e]quivalent benefits" to which an employee is entitled upon return from FMLA leave, the regulations state:

Equivalent benefits. Benefits include all benefits provided or made available to employees by an employer, including group life insurance, health insurance, disability insurance, sick leave, annual leave, educational benefits, and pensions, regardless of whether such benefits are provided by a practice or written policy of an employer through an employee benefit plan . . .

>(2) An employee may, but is not entitled to, accrue any additional benefits or seniority during unpaid FMLA leave. Benefits accrued at the time leave began, however, (e.g., paid vacation, sick or personal leave to the extent not substituted for FMLA leave) must be available to an employee upon return from leave.

29 C.F.R. § 825.215(d)(2). Thus, the accrual of seniority while on leave is not a right or benefit the FMLA protects.

Prior to her FMLA leave, plaintiff was senior to Goodwin because, as the minutes show, the Board appointed her before him. Plaintiff was also senior, by 21 days, to Murphy, who was appointed approximately one month after her.[14] It is undisputed that upon her return to work, the District restored her to the position of having 2 years of seniority, which the same the amount of seniority she had before her unpaid leave.[15] As stated, because the FMLA does not entitle and employee to the accrual of seniority while on unpaid leave, no reasonable fact finder could conclude that the District failed to restore her to an equivalent position under the FMLA. Thus, the District and Board are entitled to summary judgment on this claim.

Plaintiff argues that since she was more senior to Goodwin and Murphy prior to her

---

[14]New York regulations define seniority as "length of service in a designated tenure area, rather than length of service in the district; such service need not have been consecutive but shall during each term for which seniority credit is sought, have constituted a substantial portion of the time of the professional educator." 8 NYCRR 30-1.1(f).

[15]Although the parties presented no evidence of a written policy regarding the method the District utilizes to calculate seniority, it is undisputed that it does not count unpaid leave in determining "length of service".

unpaid FMLA leave, restoration to an equivalent position or status required the District to place her ahead of Goodwin and Murphy upon her return. The FMLA does not support plaintiff's argument. While plaintiff was entitled to be restored to the position of seniority that she held prior to her FMLA leave, i.e., 2 years, because under District policy and New York regulations, seniority was defined by "length of service", 8 NYCRR 30-1.1(f), and accrued only by working or during paid leave, she was not entitled to be treated as if she had worked during her period of unpaid leave. *See, e.g., Bailey v. Pregis Innovative Packaging, Inc*., 600 F.3d 748, 752 (7th Cir. 2010) (explaining, in discussing benefit accrual under the FMLA, that "An employee must not be penalized by being deprived, just because he is on family leave, of a benefit that he has earned (i.e., that has accrued to him) by working. But by the same token he cannot, when on family leave, accrue benefits that accrue only by working. The statute is explicit that an employee does not accrue seniority by being on family leave, 29 U.S.C. § 2614(a)(3)(A)"); *Sommer v. The Vanguard Grp.*, 461 F.3d 397, 404-05 (3d Cir. 2006) (distinguishing between "two classifications of company bonus programs for purposes of an FMLA interference action" and concluding that the bonus at issue, which contained an "hours-based annual production requirement" requiring employees to work 1,950 hours, was "akin" to a bonus program that "'requir[ed] some positive effort on the employee's part at the workplace,'" and that an employee "who has less than 1,950 hours worked naturally receives a lesser bonus" and that the company did not interfere with employee's FMLA rights by prorating bonus payments for leave taken*); Diiorio v. Manor*, No. 06-cv-02400-JF, 2007 WL 519252, at * 1-2 (E.D. Pa. Feb. 12, 2006) (rejecting the plaintiff's claim that employer interfered with his FMLA rights when it assigned him in a "less favorable position on the overtime list" based on its policy of placing "persons who have been absent on

leave for more than three weeks, in the least favorable position on the overtime list" despite placement in a "better position on the overtime list immediately before commencing his FMLA leave", explaining that plaintiff was "seeking retroactive accrual of work-related benefits to which he is not entitled, since he was not working during his period of FMLA leave" and that the while the plaintiff "was entitled to be restored to his position which he held when the FMLA leave commenced, and without the loss of 'any employment benefit accrued prior to the date on which the leave commenced' . . . [h]e was not entitled to be treated as if he had actually worked during the period of his leave.") (quoting 29 U.S.C. § 2614).

Here, plaintiff has adduced no evidence that any teacher in the District accrued seniority while on unpaid leave. Thus, no rationale jury could conclude that District interfered with plaintiff's FMLA rights by returning her to her position of holding 2 years of seniority, even if that meant she was, as she contends, behind Goodwin and Murphy upon her return because they had worked 23 days and 2 days more than plaintiff had. Accordingly, the District and the Board are entitled to summary judgment on this claim.

**Interference - Notice**

Plaintiff contends that defendants' failure to notify her that her unpaid leave would not count toward seniority interfered with her FMLA right to return to an equivalent position and that she would have returned to work at the end of her paid leave had she known her unpaid leave would not count toward seniority. The Second Circuit has recognized the potential for an interference cause of action based on "an employer's failure to post a notice where that failure leads to some injury." *Kosakow v. New Rochelle Radiology Assocs.*, 274 F.3d 706, 23-24 (2d Cir. 2001). "Where the employee is not provided with the necessary information regarding the

employer's FMLA leave policies, the employee is denied the ability to conform a desired period of leave to the employer's policies so as to preserve the right to reinstatement, a benefit at the crux of the FMLA's provisions." *Ridgeway v. Royal Bank of Scotland Grp.*, 3:11-cv-976, 2012 WL 1033532, at *7 (D. Conn. March 27, 2012).

In support of her argument, plaintiff cites the "Special rules for school employees, restoration to an 'equivalent position'" contained in 29 C.F.R. § 825.604, which state, in pertinent part:

> The determination of how an employee is to be restored to "an equivalent position" upon return from FMLA leave will be made on the basis of "established school board policies and practices, private school policies and practices, and collective bargaining agreements." The "established policies" and collective bargaining agreements used as a basis for restoration must be in writing, must be made known to the employee prior to the taking of FMLA leave, and must clearly explain the employee's restoration rights upon return from leave. Any established policy which is used as the basis for restoration of an employee to "an equivalent position" must provide substantially the same protections as provided in the Act for reinstated employees. See § 825.215. In other words, the policy or collective bargaining agreement must provide for restoration to an "equivalent position" with equivalent employment benefits, pay, and other terms and conditions of employment. For example, an employee may not be restored to a position requiring additional licensure or certification.

29 C.F.R. § 825.604 (version in effect during the relevant time period)

The Second Circuit has, however, "decline[d] to interpret the FMLA as giving an employee a right to sue the employer for failing to give notice of the terms of the Act where the lack of notice had no effect on the employee's exercise of or attempt to exercise any substantive right conferred by the Act." *Sarno v. Douglas Elliman-Gibbons & Ives, Inc.*, 183 F.3d 155, 162 (2d Cir. 1998). As discussed, the FMLA specifically excludes from its requirements, "the accrual of . . . seniority . . . during any period of leave." 29 U.S.C. § 2614(1)(3)(A). Thus, even assuming that plaintiff would have returned to work earlier if she had received notice that seniority did not

accrue during unpaid leave, because the accrual of seniority is not a substantive right under the FMLA, no reasonable fact finder could conclude that the District's failure to provide notice,[16] interfered with plaintiff's FMLA rights. *See Sarno*, 183 F.3d at 162 ("to the extent that Sarno contends that the assumed right to notice stands as an independent right under the Act, and that an employee may sue the employer for failure to give notice even if that failure in no way affected the employee's leave, benefits, or reinstatement, we reject that contention."). Moreover, it is undisputed that plaintiff received 12 weeks of FMLA leave and was restored to an equivalent position, in all respects, upon her return. Accordingly, the District and the Board are entitled to summary judgment on plaintiff's notice claim.

**Interference - Discouragement**

Plaintiff asserts that: "the FMLA does not allow an employer to deduct unpaid leave designated as FMLA leave to affect the seniority status of an employee because doing so will discourage the employee from exercising his or her FMLA rights". Thus, plaintiff argues that the District and Board interfered with her FMLA rights because had she known she would not accrue seniority during a period of unpaid leave, she would have been discouraged from exercising her right to take 12 weeks of leave.

"Regulations promulgated under FMLA provide, '[i]nterfering with the exercise of an employee's rights would include, for example, not only refusing to authorize FMLA leave, but discouraging an employee from using such leave.'" *Reilly v. Revlon, Inc.*, 620 F.Supp.2d 524, 535 (S.D.N.Y. 2009) (quoting 29 C.F.R. § 825.220(b) (internal quotes omitted)). A plaintiff proceeding on a "discouragement theory" must offer evidence that she tried to assert her FMLA

---

[16]The District does not dispute plaintiff's assertion that it failed to provide such notice.

rights but was discouraged from doing so in such a way that would have "dissuaded a similarly situated employee of ordinary resolve from attempting to exercise his or her FMLA rights." *Reilly*, 620 F.Supp.2d at 535. Since the FMLA specifically excludes seniority accrual from the rights and benefits it protects, plaintiff's claim fails as a matter of law. Further, plaintiff adduces no evidence showing that the District discouraged her in any way from utilizing her FMLA leave. Thus, the District is entitled to summary judgment on this claim.

**Interference - Disparate Treatment**

Plaintiff argues that defendants' seniority policy interfered with her FMLA rights because it "deducts" the seniority of those who take unpaid leave but does not similarly "deduct" the seniority of those who take paid forms of leave.

29 C.F.R. § 825.207 states, in pertinent part:

(a) *Generally, FMLA leave is unpaid leave*. However, under the circumstances described in this section, FMLA permits an eligible employee to choose to substitute accrued paid leave for FMLA leave. If an employee does not choose to substitute accrued paid leave, the employer may require the employee to substitute accrued paid leave for unpaid FMLA leave. The term substitute means that the paid leave provided by the employer, and accrued pursuant to established policies of the employer, will run concurrently with the unpaid FMLA leave. Accordingly, the employee receives pay pursuant to the employer's applicable paid leave policy during the period of otherwise unpaid FMLA leave. *An employee's ability to substitute accrued paid leave is determined by the terms and conditions of the employer's normal leave policy*. When an employee chooses, or an employer requires, substitution of accrued paid leave, the employer must inform the employee that the employee must satisfy any procedural requirements of the paid leave policy only in connection with the receipt of such payment. See § 825.300(c). If an employee does not comply with the additional requirements in an employer's paid leave policy, the employee is not entitled to substitute accrued paid leave, but the employee remains entitled to take unpaid FMLA leave. *Employers may not discriminate against employees on FMLA leave in the administration of their paid leave policies*.

29 C.F.R. § 825.207(a) (emphasis added).[17]

Although defendants' policy allows the accrual of seniority during paid leave, but not during unpaid leave, this disparate treatment does not violate the FMLA. The FMLA does not preclude employers from offering employees paid medical-leave benefits in tandem with FMLA unpaid leave. *Allen v. Butler Cnty. Comm'rs*, 331 F. App'x 389, 393 (6th Cir. 2009) (citing 29 C.F.R. § 825.207(a)). Plaintiff has adduced no evidence that the District permitted seniority to

---

[17]The statute provides:

(c) Unpaid leave permitted

Except as provided in subsection (d) of this section, leave granted under subsection (a) may consist of unpaid leave. Where an employee is otherwise exempt under regulations issued by the Secretary pursuant to section 213(a)(1) of this title, the compliance of an employer with this subchapter by providing unpaid leave shall not affect the exempt status of the employee under such section.

(d) Relationship to paid leave

    (1) Unpaid leave

    If an employer provides paid leave for fewer than 12 workweeks (or 26 workweeks in the case of leave provided under subsection (a)(3) of this section), the additional weeks of leave necessary to attain the 12 workweeks (or 26 workweeks, as appropriate) of leave required under this subchapter may be provided without compensation.

    (2) Substitution of paid leave

    (A) In general

    An eligible employee may elect, or an employer may require the employee, to substitute any of the accrued paid vacation leave, personal leave, or family leave of the employee for leave provided under subparagraph (A), (B), (C), or (E) of subsection (a)(1) of this section for any part of the 12-week period of such leave under such subsection.

29 U.S.C. §§ 2612(c) and (d).

accrue for any other type of unpaid leave, such as leave covered by the "Other Leave of Absence" provision in section 5(F) of the CBA, which is also unpaid. *Cf. Sommer*, 461 F.3d at 405-06 (finding no FMLA interference where employer prorated bonus for the amount of time the employee was out on FMLA leave, explaining that vacation and sick leave typically are treated differently than other forms of leave, and if they were not "[employers would then be faced with the choice of providing full production bonuses to those employees who potentially miss up to 12 weeks of work in a 12-month period, or prorating the productions bonuses of all employees who take accumulated vacation or sick leave." (citing 29 U.S.C. § 2614(a)(3)). Thus, defendants are entitled to summary judgment as a matter of law on this claim.

Plaintiff further contends that defendants interfered with her rights by prohibiting her from using the paid sick leave she had in her "sick bank" for the duration of her FMLA leave, even though she was no longer "disabled". As stated above, the FMLA permits employers to allow employees to substitute paid annual or sick leave for FMLA leave. 29 U.S.C. §§ 2612(c) and (d). The regulations explain, however, that an "employee's ability to substitute accrued paid leave is determined by the terms and conditions of the employer's normal leave policy." 29 C.F.R. § 825.207(a). It is undisputed that the CBA's child care leave policy only allowed the substitution of paid sick leave upon an employee's showing of disability, Art. 5.C.4., or to care for a sick family member, Art. 5.B.2. Plaintiff does not contend that she or a family member was ill or disabled at any time during the period of her 23-day unpaid FMLA leave. Thus, defendant is entitled to summary judgment on this claim.

**FMLA - Retaliation**

Plaintiff claims that the District retaliated against her for taking leave under the FMLA.

Both parties move for summary judgment on this claim. FMLA retaliation claims are analyzed pursuant to the burden-shifting framework of *McDonnell Douglas Corp., v. Green*, 411 U.S. 792 (1973). *See, e.g.*, *Potenza*, 365 F.3d at 167–68. To establish a prima facie case of retaliation plaintiff must show that (1) she exercised rights protected under the FMLA, (2) she was qualified for her position, (3) she suffered an adverse employment action, and (4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent. *Id*. at 168. If plaintiff establishes a prima facie case, then the burden shifts to the District to articulate a legitimate, non-discriminatory reason for its actions. *McDonnell Douglas*, 411 U.S. at 802. "Upon such a showing, the defendant must demonstrate legitimate reasons for its actions, whereupon the plaintiff bears the burden of showing that the defendant's explanations are pretext for the true discriminatory motive." *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 714 (2d Cir.1996).

Viewing the facts in the light most favorable to plaintiff, the Court finds she establishes a prima facie case of retaliation: (1) she exercised her right to take 12 weeks of leave under the FMLA; (2) it is undisputed that she was qualified for her elementary teaching position; (3) she was terminated; and (4) after telling her that her position was being cut due to budgetary reasons, Superintendent Sharkey asked about her baby and then, in reference to her unpaid FMLA leave, told her "[t]hose 24[18] days got you".

The District contends that plaintiff was laid off because it had to cut four positions in the elementary tenure area, which state law requires to be done in inverse order of seniority, and plaintiff was the fourth least senior teacher in that tenure area. Thus, the Court concludes, for

---

[18]There is some ambiguity in the record as to whether Superintendent Sharkey said 23 or 24 days. It is undisputed that plaintiff took 23 days of unpaid FMLA leave.

summary judgment purposes, that the District has satisfied its burden of providing a legitimate, non-discriminatory reason for deciding to lay off plaintiff.

The burden therefore returns to plaintiff to show that the District's reason was a pretext for retaliation. Plaintiff fails to proffer evidence that would allow a reasonable trier of fact to find that the District's non-discriminatory reason for laying her off - she was the fourth least senior teacher in the elementary tenure area - was pretext for retaliating against her for exercising her right to take FMLA leave. Although the seniority list incorrectly excluded two sixth grade teachers, even if they had been included on the list, plaintiff still would have been the fourth least senior teacher and subject to lay off. Moreover, Superintendent Sharkey's single comment that "[t]hose 24 days got you" regarding the impact of plaintiff's days of unpaid leave on her seniority is factually correct and insufficient to show retaliatory intent. *See Douglas v. Banta Homes Corp.*, No. 11 Civ. 7217, 2012 WL 4378109, at *4 (S.D.N.Y. Sept. 21, 1012) ("A single statement alone cannot support an inference of discriminatory intent."); *Timbie v. Eli Lilly & Co.*, 429 F. App'x 20, 23–24 (2d Cir. 2011) (finding a single remark, which the Court found "facially age-based", "insufficient to allow [plaintiff] to carry her burden in showing that age-discrimination was the 'but-for' cause"). Thus, there is no evidence from which a reasonable jury could find that the District's conclusion that she was the fourth least senior teacher and subject to being laid off was motivated by retaliatory animus.

**Title VII, PDA and NYSHRL** - **District, Board and Individual Defendants**

Plaintiff alleges that the District and the Board violated Title VII and the PDA and that the individual defendants violated the NYSHRL by discriminating against her on the basis of her gender and pregnancy. Plaintiff's sole argument is that she was injured by the disparate treatment

-38-

under the leave policies. She asserts that there is "direct evidence of gender discrimination based on defendants' different treatment afforded to female teachers on child care leave and teachers on other non-medical leave."[19] The Pregnancy Discrimination Act of 1978 ("PDA") amended Title VII to clarify that pregnancy discrimination is a form of unlawful sex discrimination. *See Morran v. Cnty. of Orange*, No. 08 CV 11286, 2012 WL 336158, *3–4 (S.D.N.Y. Jan. 26, 2012) (citing 42 U.S.C. § 2000e(k)). The PDA provides that "women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes, ... as other persons not so affected but similar in their ability or inability to work ...." 42 U.S.C. § 2000e(k); *see also Quaratino v. Tiffany & Co.*, 71 F.3d 58, 63 (2d Cir. 1995) (noting that the NYSHRL "provides the same sort of protection" regarding pregnancy discrimination as Title VII). Employers are thus obligated to "apply the commencement and duration of leave, the availability of extensions, and reinstatement after leave on the same terms as applied to other disabilities." *Reilly*, 620 F.Supp.2d at 544 (citing 29 C.F.R. § 1604.10(b)). Thus, to make out her pregnancy discrimination claim, "the plaintiff must show that she was treated differently from others who took leave or were otherwise unable or unwilling to perform their duties for reasons unrelated to pregnancy or that she simply was treated differently because of her pregnancy." *E.E.O.C. v. Bloomberg L.P.*, 967 F.Supp.2d 816, 832 (S.D.N.Y. 2013) (citing *Velez v. Novartis Pharm. Corp.*, 244 F.R.D. 243, 264 (S.D.N.Y. 2007)). Absent direct evidence of pregnancy

---

[19]To the extent plaintiff also claims that the leave policies are themselves discriminatory, her claim fails. Under the CBA, upon a showing of disability, any teacher may use paid sick leave. Additionally, any teacher may use up to 5 consecutive days to attend to an ill family member. Finally, all teachers, male and female, are entitled to take up to three semesters of unpaid child care leave, and women who give birth may use their sick time during the period of time they are disabled. Thus, there is no basis on which a reasonable fact finder could conclude the leave provisions in the CBA discriminate on the basis of gender or pregnancy.

discrimination, courts analyze such claims under the *McDonnell Douglas* burden-shifting framework. *See Morran*, 2012 WL 336158, at *3.

To establish a prima facie case of employment discrimination based on disparate treatment plaintiff must demonstrate (1) she belonged to a protected class; (2) she was qualified for her position; (3) she was subjected to an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination. *Terry*, 336 F.3d at 137–38 (citing *Collins v. New York City Transit Auth.*, 305 F.3d 113, 118 (2d Cir.2002) (Title VII)). "A showing of disparate treatment—that is, a showing that the employer treated plaintiff 'less favorably than a similarly situated employee outside his protected group'—is a recognized method of raising an inference of discrimination for purposes of making out a prima facie case." *Mandell v. Cnty. of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003) (quoting *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000)). In order to raise an inference of discrimination by showing that she was subjected to disparate treatment, however, "the plaintiff must show she was 'similarly situated in all material respects' to the individuals with whom she seeks to compare herself." *Graham*, 230 F.3d at 39 (quoting *Shumway v. United Parcel Serv., Inc*., 118 F.3d 60, 64 (2d Cir. 1997)).

The Court assumes, without deciding, that plaintiff establishes her prima facie burden with respect to the first three factors: she is a woman, was pregnant and utilized disability and child care leave; she was qualified for her position; and she was among the four least senior teachers in the elementary education tenure area because the District would not allow her to use her paid sick leave for purposes of child care leave unless she could show she was disabled. Plaintiff, however, has failed to adduce evidence showing that any employee, male or female, was permitted to use

paid sick leave when neither they, nor a member of their family, was sick or disabled. It is undisputed that Higgins, LaBarge and Reinhard received paid sick leave during the 5 days after their wives gave birth. There is no evidence whatsoever that their wives were not disabled during that time period. Nor is there any evidence, that any teacher, after she, or a spouse, had recovered from disability following childbirth, received paid child care leave. Thus, plaintiff, who was not disabled and who does not claim a member of her family was disabled during the time period for which she contends she should have been allowed to use paid sick leave, was not similarly situated to the male teachers who used sick leave while their spouses were disabled. The Court therefore concludes that plaintiff fails to establish a prima facie case of disparate treatment. Accordingly, defendants are entitled to summary judgment on these claims.

**Title VII - Teacher's Association**

Plaintiff argues: "defendant Association breached its duty of fair representation and acquiesced in the discriminatory practices of defendant School District." Discrimination by unions is prohibited by Title VII, which makes it "an unlawful employment practice for a labor organization ... to exclude or to expel from its membership, or otherwise to discriminate against, any individual because of his race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(c)(1); *see Yerdon v. Henry*, 91 F.3d 370, 375 (2d Cir. 1996) (finding that a labor union could be liable under Title VII). A Title VII claim brought against a union, however, is evaluated differently than such a claim against an employer. To succeed plaintiff first must show that "the union breached its duty of fair representation to [her]." *Oparji v. United Fed'n of Teachers*, 418 F.Supp.2d 139, 147 (E.D.N.Y. 2006). A union breaches its duty of fair representation when (a) "its conduct toward a member ... is arbitrary, discriminatory, or in bad faith," *Marquez v. Screen*

-41-

*Actors Guild, Inc*., 525 U.S. 33, 44 (1998), and (b) the alleged misconduct injures the plaintiff. *Spellacy v. Airline Pilots Assoc.-Int'l*, 156 F.3d 120, 130 (2d Cir.1998). If plaintiff establishes breach of the duty of fair representation, she then "must show some indication that the union's actions were motivated by unlawful discrimination or retaliation." *Oparji*, 418 F.Supp.2d at 146.

Plaintiff argues that the Teacher's Association breached its "duty of fair representation" to her by "acquiescing" in the District's discriminatory application of the CBA's leave provisions. As discussed above, there are no material issues of fact regarding the disparate treatment of male and female teachers with respect to the utilization of sick leave. Plaintiff raises no additional arguments regarding the Teacher's Association's involvement. Accordingly, the Teacher's Association is entitled to summary judgment on this claim.

## 42 U.S.C. § 1983 - Equal Protection

Plaintiff contends that when the District granted her leave in connection with the birth of her child, it "violated Section 1983 by denying her privileges granted to her male counter parts and teachers on other non-medical leaves." Section 1983 allows an action at law against a "person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. The Second Circuit has held that sex-based discrimination may be actionable under § 1983 as a violation of equal protection. *See Kern v. City of Rochester*, 93 F.3d 38, 43 (2d Cir. 1996). Accordingly, § 1983 and the Equal Protection Clause protect public employees from various forms of discrimination, including disparate treatment, on the basis of gender. *See Feingold v. New York*, 366 F.3d 138, 159 & n. 20 (2d Cir. 2004) (reasoning that § 1983 equal protection

claims parallel Title VII claims); *Back v. Hastings on Hudson Union Free Sch. Dist.*, 365 F.3d 107, 123 (2d Cir. 2004) (applying *McDonnell Douglas* framework to § 1983 case).

Here plaintiff claims that the District, the Board, Superintendent Skarkey and Board President Kusminsky "have created an enforced a policy or practice that provides an employment privilege or benefit to male teachers and teachers on other non-medical leaves not afforded to the plaintiff." Plaintiff seeks to hold Superintendent Sharkey and Board President Kusminsky liable on the basis that they used their "policymaking authority" to create and enforce "a leave of absence policy that afforded male teachers on child care leave and teachers on other non-medical leave employment privileges and benefits not afforded to the plaintiff and female teachers on child care leaves of absence." For the reasons discussed above with respect to plaintiff's Title VII claim, the Court concludes that plaintiff fails to raise a material issue of fact requiring trial on her equal protection claim. Defendants are therefore entitled to summary judgment as a matter of law.

**Title IX**

Plaintiff argues that defendants violated Title IX by discriminating on the basis of sex in layoff and "application of nepotism policies". Title IX provides in pertinent part: "No person in the United States shall, on the basis of sex ... be denied the benefits of, or be subjected to discrimination under any education program or activity receiving federal financial assistance." 20 U.S.C. § 1681(a). The Second Circuit has not yet decided whether an employee of an educational institution covered by Title IX may bring an employment discrimination action under Title IX, or whether the employee must resort to a Title VII action. *See Summa v. Hofstra*, 708 F.3d 115, 131-32 (2d Cir. 2013) (declining to reach the issue); *Univ Torres v. Pisano*, 116 F.3d 625, 630, n.3 (2d Cir. 1997) (same). District courts in this circuit are divided on the question. *See Stouter v.*

*Smithtown Cent. Sch. Dist.*, 687 F.Supp.2d 224, 236 (E.D.N.Y. 2010) (citing cases). Because Title IX claims are generally assessed under the same legal standards as Title VII claims, *see generally Murray v. New York Univ. Coll. of Dentistry*, 57 F.3d 243, 249 (2d Cir.1995) (discrimination claim brought by student), plaintiff's claims of disparate treatment fail here as well. The Court, however, pauses to address plaintiff's allegations regarding the memoranda of understanding executed between the District and the Union in 2007. The memoranda prohibited the District's then practice of allowing teachers the use of sick leave during child care leave after they were no longer disabled, on the basis that such practice violated the CBA. The first memorandum established the effective date as July 2006. The second memorandum postponed the effective date until February 2007. Plaintiff asserts that this is evidence of Superintentent Sharkey's nepotism because the postponement of the effective date allowed the superintendent's sister, Susan Russell, to benefit from the prior practice while on disability and child care leave. Because the change in practice precedes plaintiff's employment, the Court finds these facts to be immaterial to plaintiff's Title IX claim. Accordingly, defendants are entitled to summary judgment dismissing the Title IX claim.

**Breach of Fair Duty of Representation**

"An employee's claim against a union for breaching its duty of fair representation . . . is a cause of action 'implied under the scheme' of the National Labor Relations Act ('NLRA'), 29 U.S.C. § 151-169." *Kalyanaram v. Am. Ass'n of Univ. Professors at N.Y. Institute of Tech.*, Inc., 742 F.3d 42, 46 (2d Cir.2014). To prevail on this claim, plaintiff must demonstrate (1) "that the union's actions or inactions are either arbitrary, discriminatory, or in bad faith" and (2) a causal connection between the union's wrongful conduct and [his] injuries." *Vaughn v. Air Line Pilots*

*Ass'n, Int'l*, 604 F.3d 703, 709 (2d Cir. 2010).

Plaintiff claims that the Union acted arbitrarily, in bad faith and discriminatorily by: (1) lying to her about its investigation of her claims that the District was targeting teachers on child care leave and interfering with her FMLA rights; (2) conspiring with the District to remove sixth grade teachers from the seniority list in order to ensure plaintiff was among the lowest in seniority; (3) withholding the seniority list from her; and (4) refusing to file a grievance on her behalf.

A union acts arbitrarily "only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a wide range of reasonableness as to be irrational."*Air Line Pilots Ass'n, Int'l v. O'Neill*, 499 U.S. 65, 67 (1991). To demonstrate bad faith, plaintiff must show that the union's actions constitute "fraud, deceitful action or dishonest conduct." *Nicholls v. Brookdale Univ. Hosp. & Med. Ctr.*, No. 05–CV–2666(JBW), 2005 WL 1661093, at *7 (E.D.N.Y. July 14, 2005) (citing *Amalgamated Ass'n of St., Elec. Ry. & Motor Coach Emp. v. Lockridge*, 403 U.S. 274, 299 (1971))."A union's acts are discriminatory when substantial evidence indicates that it engaged in discrimination that was intentional, severe, and unrelated to legitimate union objectives." *Vaughn*, 604 F.3d at 709–10 (citation omitted). The Court's review of a union's representation is "highly deferential, recognizing the wide latitude that unions need for the effective performance of their bargaining responsibilities." *Vaughn*, 604 F.3d at 709 (internal quotation marks and citations omitted).

Plaintiff claims that Karker lied to her when he told her that he had discussed her concerns with an attorney because, in fact, neither he nor the Union ever consulted an attorney. Karker admitted that he did not consult an attorney, but, asserted that he acted in accordance with the

pertinent "protocol and procedure" by contacing Stelling, the labor relations specialist assigned to the District. Stelling testified that he did not discuss the impact of plaintiff's FMLA leave on her seniority with any NYSUT attorneys. While Karker denies ever telling plaintiff he would contact an attorney, this question of fact is immaterial because even assuming Karker lied to plaintiff, it is undisputed that he undertook his own investigation of her claims and consulted extensively with Stelling, who also investigated and considered plaintiff's claims in consultation with the NYSUT staff director and other colleagues. Thus, while Karker's misrepresentation may support an inference of negligence, it is insufficient to show bad faith. Likewise, his decision to withhold the seniority list from plaintiff is also insufficient to show bad faith. *See Bejjani v. Manhattan Sheraton Corp.*, 567 F. App'x 60, 64 (2d Cir. 2014) (finding the union representatives' misrepresentations regarding whether they had sent requests for information to the employer and meeting dates were "minor discrepancies that do not indicate intentional misrepresentation and, when viewed in totality support at most an inference of negligence, not bad faith or a conspiracy.").

Further, even though the Union and the District were incorrect in their conclusion that sixth grade teachers should not be included on the elementary tenure seniority list, "it was hardly irrational, dishonest, or unrelated to Union objectives" to take such a position "given its benefits for other Union members." *Bejjani*, 567 F. App'x at 63 (citing *Spellacy*, 156 F.3d at 129 ("A union's reasoned decision to support the interests of one group of employees over the competing interests of another group does not constitute arbitrary conduct.")). Stelling, who advised Karker, was concerned that the District, and the sixth grade teachers would be left in an impossible position in the event of recall if they were placed in the elementary education tenure area. He

-46-

testified that he was concerned if Goodwin and Murphy, who were certified in Math and English, were "laid off and on a preferred eligibility list in the elementary tenure area they could be recalled to a kindergarten job, a first, a second, a third, a fourth grade job, for which they would not be certified" and would be, therefore, unable to teach at the elementary school. Thus, the Union had a rational basis for concluding the exclusion of sixth grade teachers from the elementary education area seniority list. *See Clayton v. Republic Airlines, Inc.*, 716 F.2d 729, 732 (9th Cir.1983) ("[C]ourts have observed that within th[e] context [of integration of seniority lists], it is almost inevitable that some individuals will be injured, and that even where the same union represents both bodies of employees, it does not breach its duty to individual members as long as it proceeds on some reasoned basis."); *Spellacy*, 156 F.3d ay 127 (the Court's inquiry "is limited to whether the union took a position on the basis of an informed, reasoned judgment regarding the merits of the claim in light of the language in the collective bargaining agreement."). Moreover, even if Goodwin and Murphy were included on the seniority list, plaintiff still would have been, as a result of her 23 days of unpaid leave, the least senior of the three. For these reasons, even if there was, as plaintiff asserts, a agreement or conspiracy between the District and the Union to exclude sixth grade teachers from the seniority list, she has failed to adduce evidence that it harmed her.

In the context of claims that a union failed to file a grievance on a member's behalf, a union "may not arbitrarily ignore a meritorious grievance or process it in perfunctory fashion."*Vaca v. Sipes*, 386 U.S. 171, 191 (1967). However, "the union has the discretion to refuse to pursue claims which it believes are without merit."*Ayazi v. United Fed'n of Teachers, Local 2*, NO. 99 CV 9222(CLP), 2011 WL 888053, at *15 (E.D.N.Y. Mar. 14, 2011) (internal

quotation omitted). In this case, the undisputed evidence shows that Karker and Union representatives actively investigated plaintiff's claims. Karker met with plaintiff twice and contacted his superiors to notify them of her concerns and request their assistance. The Union concluded, correctly, that even assuming the sixth grade teachers should have been included on the seniority list, plaintiff still would have been among the four least senior teachers in the elementary tenure area. Thus, even viewing the facts in the light most favorable to plaintiff, no reasonable fact finder could conclude that the Union breached its duty of fair representation to her.

**CONCLUSION**[20]

For the foregoing reasons, it is hereby

**ORDERED** that the motion for summary judgment by the District, Board, Superintendent Sally Sharkey and Susan Kusminsky (Dkt. No. 88) is **GRANTED in its entirety**; and it is further

**ORDERED** that the motion for summary judgment by the Teacher's Association and Justin Karker (Dkt. No. 84) is **GRANTED in its entirety**; and it is further

**ORDERED** that the motion for summary judgment by plaintiff Donna Scarpinati de Oliveira (Dkt. No. 85) is **DENIED in its entirety**; and it is further

**ORDERED** that the Clerk of the Court is directed to enter judgment in favor of defendants and dismissing the Amended Complaint with prejudice; and it is further

**ORDERED** that the Clerk of the Court is directed to close this case.

---

[20]The Court thoroughly reviewed the extensive factual record in this case and has considered all remaining arguments and finds them either immaterial to the disposition of the motions or without merit.

**IT IS SO ORDERED.**

Date:    September 30, 2014

Norman A. Mordue
Senior U.S. District Judge